IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| HYPERHEAL HYPERBARICS, INC., | * | |
| Plaintiff, | * | |
| | | Civil Action No. RDB-18-1679 |
| v. | * | |
| ERIC SHAPIRO, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff, Hyperheal Hyperbarics, Inc. ("Hyperheal") filed suit against Defendant Eric Shapiro ("Shapiro"), the initial founder of Hyperheal and a former employee, seeking to enjoin his efforts to use and trademark the Hyperheal name. (Am. Compl., ECF No. 14.) Hyperheal brought six causes of action against Shapiro, including breach of his employment contract, tortious interference with business relations, unfair competition, and Lanham Act[1] violations. (*Id.*) A temporary restraining order was initially granted, followed by a Preliminary Injunction, which issued on September 6, 2018. (ECF Nos. 19, 44, 45.) Now pending before this Court are two motions for summary judgment: (1) Hyperheal Hyperbarics, Inc.'s Motion for Partial Summary Judgment (ECF No. 83); and (2) Defendant Eric Shapiro's Motion for Summary Judgment (ECF No. 91). A hearing was held on July 11, 2019. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Hyperheal Hyperbarics, Inc.'s Motion for Partial Summary

---

[1] The Lanham Act, 15 U.S.C. § 1501, *et seq.*, also known as the Trademark Act, is the federal statute that governs trademarks, service marks, and unfair competition.

Judgment (ECF No. 83) shall be GRANTED IN PART and DENIED IN PART, and Shapiro's Motion for Summary Judgment (ECF No. 91) shall be DENIED.

Specifically, judgment as a matter of law that Shapiro breached the Employment Agreement shall be GRANTED, and the remedy of specific performance shall be GRANTED with regard to the Pre-Termination Domain Names and social media accounts. Further, a permanent injunction (Count IV) shall be GRANTED, but the geographic scope of Hyperheal's trademark protection remains pending the jury resolution of material factual disputes. Summary judgment shall be DENIED as to Tortious Interference (Count II), Unfair Competition–Misappropriation (Count III), Lanham Act claims (Count V), and Declaratory Relief Regarding Trademark Rights (Count VI). Counts II, III, and V shall proceed to trial by jury, scheduled to commence on August 19, 2019. Based on the jury's findings of fact, this Court will issue its rulings of law related to Specific Performance, Permanent Injunction, and Declaratory Relief Regarding Trademark Rights.

Shapiro's request for judgment as a matter of law regarding his ownership of the Post-Termination Domain Names and the federally-registered trademarks is DENIED.

## BACKGROUND

In May 2007, Eric Shapiro formed Hyperheal Hyperbarics, LLC to provide hyperbaric oxygen therapy.[2] (Am. Compl. ¶ 5, ECF No. 14; ECF No. 14-1.) The LLC's corporate status was forfeited in October 2008. (Am. Compl. ¶ 7, ECF No. 14; ECF No. 14-1.) A few years later, in July 2012, Shapiro formed Hyperheal Hyperbarics, Inc. as majority owner and one of

---

[2]     Hyperbaric oxygen therapy is a therapy that involves breathing pure oxygen in a pressurized room or tube and is administered as treatment for a wide variety of medical conditions. (Am. Compl. ¶ 6, ECF No. 14.)

three directors. (Am. Compl. ¶ 8, ECF No. 14.) The Hyperheal name has been continuously registered in Maryland since that time. (Mem. Op. 2, ECF No. 44.) At the same time, through GoDaddy.com, a domain registrar, Shapiro purchased multiple internet domain names containing the Hyperheal name.[3] (Am. Compl. ¶ 9, ECF No. 14; ECF No. 83-4 at ¶¶ 2-4.) Shapiro paid the registration fees for all the domains through June 2018. (Am. Compl. ¶ 9, ECF No. 14.) Hyperheal also created a LinkedIn webpage profile, a Facebook account, and a Twitter account. (*Id.* at ¶ 10.) At that time, Shapiro was one of three directors and the majority owner of Hyperheal. (*Id.* at ¶ 8.)

On December 18, 2013, Dr. Tommy Love ("Dr. Love"), from the state of Utah, filed a trademark application with the United States Patent and Trademark Office ("USPTO") for "Hyperheal" and "Hyperheal O2." (Pl.'s Mot. Exs. 6, 7, ECF Nos. 83-8, 83-9.) The applications included a declaration that "to the best of his[] knowledge and belief no other person, firm, corporation, or association ha[d] the right to use the mark in commerce . . . ." (*Id.*) The USPTO issued a notice to Dr. Love requesting that he specifically disclaim the O2 portion of the requested marks because it is an acronym for oxygen. (*Id.*) The notice to Dr. Love included what was purported to be a capture of Dr. Love's website, but it was in actuality, Hyperheal's website including its Maryland address and phone number. (*Id.*) In Dr. Love's response to the USPTO disclaiming the O2 portion of the mark, he did not notify the USPTO that the website did not belong to Dr. Love and did not establish prior use. (*Id.*) Ultimately,

---

[3] Including Hyperheal.org, Hypherheal.info, Hyperheal.biz, Hyperheal.net, Hyperheal.us, Hyperheal.online, Hyperheal.co, and Hyperheal.mobi ("Hyperheal Domain Names"). (Am. Compl. ¶ 9, ECF No. 14.) By capturing multiple variations of the name and automatically directing them to the main website, hyperhealhyperbarics.com, Hyperheal sought to capture potential customers searching online for the name "hyperheal." (*Id.*)

in March 2015, the USPTO issued Notices of Allowance for the Hyperheal trademark to Dr. Love, and on May 31, 2016, the USPTO issued the Hyperheal trademark and identified the first use as April 2014.[4]  (*Id.*)

During this same span of time, Shapiro's business was failing.  (Am. Compl. ¶ 11, ECF No. 14.)   On February 1, 2014, Hyperheal requested Dr. Samer Saiedy, M.D. ("Dr. Saiedy") to provide a cash infusion, which resulted in Dr. Saiedy becoming a minority owner of Hyperheal, and Shapiro's ownership was reduced to 31%.  (*Id.*)  In September 2015, Dr. Saiedy provided another large cash infusion and became 97.62% majority owner of Hyperheal with Shapiro retaining 2.38% as a minority owner.  (*Id.* at ¶ 12.)  Shapiro was also retained as an Hyperheal employee. (*Id.*)   In October 2016, Shapiro was terminated from Hyperheal, although he remained a minority owner. (Mem. Op. 3, ECF No. 44.)  On November 2, 2016, Shapiro filed an application with the USPTO to trademark Hyperheal Hyperbarics, Inc., stating that he had been using the mark since March 7, 2007, and the first use in commerce was at least as early as May 11, 2012.  (Am. Compl. ¶ 61, ECF No. 14; ECF No. 14-11.)  He used his personal contact information, although with his eric@hyperheal.org email address, and included digital images from the Hyperheal website as a specimen of the mark's use in commerce.  (*Id.*)  On February 10, 2017, the USPTO sent Shapiro a Notice of Office Action stating that the registration of the mark was refused because it was likely to be confused with Dr. Love's existing trademark.  (*See* Mem. Op. 4, ECF No. 44 (citing Def.'s Ex. 12).)  Shapiro

---

[4]      Trademark registrations 4,969,176 and 4,969,175.  (Pl.'s Mot. Exs. 6E, 7G.)

did not respond to the notice, and the application was ultimately considered abandoned.  (*Id.* at 4, 6; *see also* Am. Compl. ¶ 62, ECF No. 14; ECF No. 14-12.)

On March 6, 2017, Hyperheal rehired Shapiro to work in the company as a technician, and they entered into an Employment Agreement.  (Am. Compl. ¶ 14, ECF No. 14; ECF No. 14-3.)  Under the Employment Agreement, Shapiro expressly agreed to do and refrain from doing several things, including:

> You agree that you will not engage in any marketing on behalf of [Hyperheal] without the express permission of the COO or its delegate.
>
> You will not participate on social media on behalf of [Hyperheal], including, but not limited to, email, Twitter, LinkedIn or Facebook. These social media accounts will need to be turned over to the COO, IT Director and or marketing department prior to the start of the job.
>
> You hereby relinquish and transfer to [Hyperheal] any and all ownership or other rights, if any, that you have in any intellectual property (including without limitation trademarks, copyrights, and patents), social media accounts, . . . or other property, tangible or intangible, that has ever been used in or with respect to the business operated by [Hyperheal], regardless of whether or not title to such property is currently in the name of [Hyperheal]; you will immediately take such steps (by, among other things, providing passwords and access codes) as are necessary to provide [Hyperheal] with access to and complete control over all such property; and you will, at [Hyperheal's] request, sign such documents and take such other steps as may be necessary to confirm that [Hyperheal] is the owner of all such property and accounts and to give [Hyperheal] complete control exclusive control over such property and accounts, and you will not, without [Hyperheal's] express written consent, act as [Hyperheal's] representative or agent with respect to any such property or any other matter . . . .
>
> While employed by [Hyperheal], you shall not engage in any work related to hyperbarics in Maryland without the express written permission . . . .

> You will immediately turn over, provide, and relinquish to [Hyperheal] all property, documents, and materials that have ever been used in [Hyperheal's] business and that are or may be in your possession, custody, or control. . . .
>
> You shall immediately turn over to [Hyperheal] and permanently relinquish control of any DME license and any other license, certificate, or other government or private right you may have related to [Hyperheal].

(ECF No. 14-3.) Under "effect of termination," the Employment Agreement provided that "[u]pon termination of this agreement for any reason, neither party shall have any further rights, duties or obligations under this agreement, except to carry out the provisions which contemplate performance after termination or expiration." (*Id.*)

Pursuant to the Employment Agreement, Shapiro met with Scott Hughey, Hyperheal's Director of Information Technology, on March 9, 2017 and initiated transfers of the usernames and passwords to Hyperheal's accounts at GoDaddy.com, LinkedIn, Facebook, and Twitter. (Am. Compl. ¶ 16, ECF No. 14.) Hyperheal contends that Shapiro did not mention or make any effort to assign his trademark application, nor did he mention the USPTO's Notice of Office Action or that he had spoken with various investors about the trademark. (*See* Mem. Op. 6, ECF No. 44.) Shapiro testified at his deposition that he discussed the trademark application with Hyperheal staff, Dr. Ziad Mirza and Jennifer Parmenter. (Def.'s Resp. Mem. 18, ECF No. 91-1 (citing Exs. 19, 20, 21).) There is clearly a factual dispute on this question.

A little more than a year later, on March 23, 2018, Hyperheal terminated Shapiro's employment for "unprofessional, unethical or fraudulent conduct" related to improper billing practices. (Am. Compl. ¶¶ 13, 17-18, ECF No. 14.) On April 18, 2018, counsel for Shapiro

sent a letter to Hyperheal complaining that Shapiro had incurred charges of $273.29 for the maintenance of four domains[5] between January 8, 2018 and February 12, 2018. (ECF No. 14-6.) Shapiro requested reimbursement and confirmation that the domains had been fully transferred and would be maintained by Hyperheal. (*Id.*) Two days later, on April 20, 2018, Shapiro sent an email to GoDaddy.com stating that he had retained counsel to resolve a violation of his employment agreement, requesting control and access to his domains[6] or alternately, that they be frozen until resolved. (Pl.'s Mot. Ex. 15, ECF No. 83-17.) He further indicated that the purchase of hyperhealhyperbarics.com by Hyperheal "violates the anti-cyber squatting act." (*Id.*) He used an email address of eric.hyperheal@gmail.com and included a signature line with the Hyperheal company name and logo, identifying himself as "Founder." (*Id.*) In response to a request from GoDaddy.com, Shapiro provided Hyperheal's May 2012 IRS assignment of an Employer Identification Number. (Pl.'s Mot. Ex. 16, ECF No. 83-18.) As a result, GoDaddy.com notified Scott Hughey at Hyperheal that the domains[7] were being transferred to Shapiro, and the transfer completed on May 2, 2018. (Pl.'s Mot. Ex. 17-18, ECF Nos. 83-19, 83-20.)

Also on May 2, 2018, Shapiro registered with GoDaddy.com an additional 17 domain names that contained the name "Hyperheal".[8] (Pl.'s Ex. 19, ECF No. 83-21.) That same day,

---

[5]     Hyperheal.us, Hyperheal.online, Hyperheal.co, and Hyperheal.mobi. (ECF No. 14-6.)
[6]     Hyperheal.org, Hyperheal.info, Hyperheal.biz, Hyperheal.net, Hyperheal.us, Hyperheal.co, Hyperheal.online, and Hyperheal.mobi. (ECF No. 83-17.)
[7]     Hyperheal.org, Hyperheal.info, Hyperheal.biz, Hyperheal.net, Hyperheal.us, Hyperheal.mobi, Hyperheal.online, and Hyperheal.co. (ECF Nos. 83-19, 83-20.)
[8]     Hyperheal.guru, Hyperheal.life, Hyperheal.xyz, Hyperheal..me, Hyperheal..tech, Hyperhealhyperbarics.co, Hyperhealhyperbarics.biz, Hyperhealhyperbarics.online, Hyperhealhyperbarics.guru, Hyperhealhyperbarics.xyz, Hyperhealhyperbarics..life, Hyperhealhyperbarics.today, Hyperhealhyperbaricsonline.org, Hyperhealhyperbaricscenter.org, Hyperhealhyperbarics.club, Hyperhealhyperbarics.us, and Hyperheal.club. (ECF No. 83-21.)

he contacted LinkedIn, seeking full administrative access to the site and declaring that he was the owner of the Hyperheal name as well as 20 URL[9] variants of the name. (*See* Pl.'s Ex. 22, ECF No. 83-24.) Shapiro also contacted Twitter and filed a case of "brand impersonation" against Hyperheal causing the removal of the Twitter account. (*See* Pl.'s Ex. 24, ECF No. 83-26.)

Additionally, Shapiro filed a new application with the USPTO on May 1, 2018 to trademark Hyperheal Hyperbarics, Inc., stating that he had been using the mark since March 7, 2007, and the first use in commerce was at least as early as May 11, 2012.[10] (Pl.'s Mot. Ex. 12, ECF No. 83-14.) Shapiro approached Dr. Love and arranged to purchase Dr. Love's Hyperheal trademark, which was assigned to Shapiro on May 16, 2018 and recorded with the USPTO. (*See* Pl.'s Mot. Ex. 13, ECF No. 83-15.) Shapiro then amended his trademark application on May 21, 2018 to advise that he now owned Dr. Love's trademark, which should resolve any conflict issues. (*Id.*)

Ultimately, Shapiro's activities resulted in Hyperheal taking legal action in an effort to reinstate its access to the website domains, LinkedIn and Twitter accounts, and a cease-and-desist letter to Shapiro on May 18, 2018. (ECF No. 14-8.) Shapiro responded to Hyperheal's demands with his own demands, which led to Hyperheal's filing of a lawsuit against Shapiro in the Circuit Court for Baltimore County on May 30, 2018. A Temporary Restraining Order ("TRO") issued on May 30, 2018, restraining Shapiro from his attempts to control the name "Hyperheal," the Hyperheal domain names, and the social media accounts. (TRO, ECF No.

---

[9]    Uniform Resource Locater ("URL") refers to an internet website address, e.g., www.hyperheal.org.
[10]    This application was ultimately abandoned on June 24, 2018. *See* Trademark Electronic Search System, Serial No. 87902701.

5.)  It also ordered Shapiro to transfer to Hyperheal all domain names, the LinkedIn webpage, and "any other intellectual property using the name 'Hyperheal' that Shapiro now controls" and it enjoined Shapiro from pursuing the "Hyperheal Hyperbarics, Inc." trademark application.  (*Id.*)

On June 7, 2018, Shapiro removed the case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331, given the Complaint's references to intellectual property and trademark law.[11]  (ECF No. 1.)  After this Court held a teleconference with the parties, Hyperheal filed an Amended Complaint and Supplemental Motion for Temporary Restraining Order. (ECF Nos. 14, 15.) The six-count[12] Amended Complaint asserts claims for: breach of contract (Count I), tortious interference with business relations (Count II), unfair competition–misappropriation of products (Count III), declaratory relief (Count IV), Lanham Act, 15 U.S.C. § 1501, *et seq.*, violations (Count V), and declaratory relief regarding trademark rights (Count VI). (Am. Compl., ECF No. 14.)

Upon Hyperheal's deposit of $25,000 with the Clerk of the Court to act as a bond, the TRO was extended until this Court had an opportunity to hold a Preliminary Injunction hearing.  (*See* ECF Nos. 19, 22, 23.)  In mid-August 2018, this Court held two days of hearings with witness testimony, exhibits, and arguments of counsel, and on September 9, 2018, this Court entered a preliminary injunction order, which continues to enjoin Shapiro from the

---

[11]    This Court notes that at that time, Hyperheal had not yet brought any causes of action against Shapiro specifically under the Lanham Act, 15 U.S.C. § 1501, *et seq.* (ECF No. 2.)
[12]    The Amended Complaint improperly labels both its fifth and sixth counts as "Count V." Accordingly, this Court treats Plaintiff's sixth claim for declaratory relief regarding trademark rights as Count VI.

same activities as the TRO until this Court or a jury renders a final judgment on the merits of Hyperheal's claims. (ECF No. 45.)

On January 11, 2019, Hyperheal filed a motion to modify the preliminary injunction and for sanctions against Shapiro. (ECF No. 49.) Because this Court was in the middle of a multi-week bench trial, the motion was referred to a Magistrate Judge for issuance of a report and recommendation pursuant to Local Rule 301.5(a)-(b) (D. Md. 2018); 28 U.S.C. § 636(b)(1)(A) and (B). Judge Copperthite of this Court issued his report and recommendation on March 29, 2019, and it was adopted without objection on April 23, 2019, thereby denying Hyperheal's motion. (ECF Nos. 82, 92.) During this process, on April 5, 2019, the parties entered a Joint Stipulation (ECF Nos. 88, 97) under which Shapiro permanently released all control over the "Pre-Termination Domain Names."[13] and waived all rights to them. Shapiro now only claims ownership in the "Post-Termination Domain Names"[14] that he purchased after his termination on March 23, 2018, but he claims no ownership interest in any other domain names that include the word "Hyperheal" in the name. (Stip., ECF No. 88.) Control over the Post-Termination Domain Names was temporarily provided to Hyperheal. (*Id.*)

Now pending before this Court is Hyperheal's Motion for Partial Summary Judgment (ECF No. 83), and Shapiro's Motion for Summary Judgment (ECF No. 91). Both motions have been fully briefed, and a motions hearing was held on July 11, 2019. For the reasons that

---

[13]    Including: hyperhealhyperbarics.com; hyperheal.org; hypherheal.info; hyperheal.biz; hyperheal.net; hyperheal.us; hyperheal.online; hyperheal.co; hyperheal.mobi; and hyperheal.info. (Stip., ECF Nos. 88, 97.)

[14]    Including: hyperheal.guru; hyperheal.life; hyperheal.xyz; hyperheal.me; hyperheal.tech; hyperhealhyperbarics.com; hyperhealhyperbarics.biz; hyperhealhyperbarics.online; hyperhealhyperbarics.guru; hyperhealhyperbarics.xyz; hyperhealhyperbarics.life; hyperhealhyperbarics.today; hyperhealhyperbaricsonline.org; hyperhealhyperbaricscenter.org; hyperhealhyperbarics.club; hyperhealhyperbarics.us; and hyperheal.club. (Stip., ECF No. 88.)

follow, Hyperheal's motion shall be GRANTED IN PART and DENIED IN PART, and Shapiro's motion shall be DENIED.

Specifically, judgment as a matter of law that Shapiro breached the Employment Agreement shall be GRANTED, and the remedy of specific performance shall be GRANTED with regard to the Pre-Termination Domain Names and social media accounts. Further, a permanent injunction (Count IV) shall be GRANTED, but the geographic scope of Hyperheal's trademark protection remains pending the jury resolution of material factual disputes. Summary judgment shall be DENIED as to Tortious Interference (Count II), Unfair Competition–Misappropriation (Count III), Lanham Act claims (Count V), and Declaratory Relief Regarding Trademark Rights (Count VI). Counts II, III, and V shall proceed to trial by jury, scheduled to commence on August 19, 2019. Based on the jury's findings of fact, this Court will issue its rulings of law related to Specific Performance, Permanent Injunction, and Declaratory Relief Regarding Trademark Rights.

Shapiro's request for judgment as a matter of law that he owns the Post-Termination Domain Names is DENIED, and judgment as a matter of law that he owns the federally-registered trademarks is DENIED.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial.  *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility.  *See Tolan v. Cotton*, 572 U.S. 650, 656-59 (2014).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. North Carolina Dept. of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).  "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory

he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post, 871 F.2d 1144, 1148 n.4* (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). "However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they '"may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Group, Inc.*, 916 F. Supp. 2d 620 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Georgia State Conference of NAACP v. Fayette County Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

## ANALYSIS

Hyperheal seeks a judgment against Shapiro for: (i) Shapiro's breach of his employment agreement and specific performance of his contract obligations; (ii) Shapiro's liability for his tortious conduct; (iii) Shapiro's Lanham Act violations including cancelation of the registered trademarks Shapiro obtained; and (iv) permanent injunctive relief against Shapiro relative to Hyperheal's intellectual property. (Pl.'s Mot. Mem. 2, ECF No. 83-1.) Although not listed in this summary, it appears that Hyperheal also seeks summary judgment on Count III – Unfair Competition – Misappropriation of Products under Maryland law. (*See id.* at 23-24, ECF No. 83-1.) Hyperheal suggests that the only issues remaining for trial are compensatory and punitive damages for Shapiro's tort liability. (*Id.* at 2.) By his motion, Shapiro seeks to keep the trademarks and domains that he purchased after his termination from Hyperheal (*see* Stip., ECF No. 88).

## I.    Breach of Contract (Count I)

Hyperheal asserts that the Employment Agreement obligated Shapiro to "relinquish and transfer to [Hyperheal] any and all ownership or other rights" in any Hyperheal intellectual property. (Pl.'s Mot. Mem. 16, ECF No. 83-1.) Hyperheal seeks to have this Court require Shapiro to transfer ownership of all intellectual property to Hyperheal.[15] The "intellectual property" in dispute includes (1) the business name "Hyperheal"; (2) the Hyperheal trademarks for hyperbaric treatment services; (3) website domain names containing the Hyperheal name; and (5) Hyperheal's social media accounts. (*Id.* at 16-17.) Additionally, Hyperheal seeks rights to the term "hyperheal." (Pl.'s Reply 1, ECF No. 98.) Hyperheal seeks to have Shapiro permanently enjoined from asserting control over the described property, from representing any affiliation or ownership in any entity containing the name "Hyperheal." and from using the term "Founder" related to Hyperheal. (Pl.'s Mot. Mem. 16, ECF No. 83-1.)

Under Maryland law, a plaintiff suing for breach of contract must show simply "that the defendant had a contractual obligation and that the obligation was breached." *Mathis v. Hargrove*, 888 A.2d 377, 396 (Md. Ct. Spec. App. 2005); *see also EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 540 (D. Md. 2014) (citing *RRC Northeast, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010)). "It is not necessary that the plaintiff prove damages resulting from the breach." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).

---

[15]    After the filing of Hyperheal's pending motion, Shapiro entered into a consent agreement under which he transferred all the Pre-Termination Domain Names to Hyperheal and permanently released all control over, and waived all rights to, those specific names. (Stip., ECF Nos. 88, 97.) Shapiro also transferred temporary control over the Post-Termination Domain Names to Hyperheal, but he continues to assert ownership over the website domain names that he purchased after his termination. (*Id.*)

The parties do not dispute that Shapiro had contractual obligations to Hyperheal. However, the parties disagree on contract interpretation, specifically whether the contract included an obligation for Shapiro to relinquish the name "Hyperheal" permanently, which included any website domain names and trademarks that incorporated the name. Shapiro argues that he did not breach his obligations because he relinquished everything he owned at the time, thus fulfilling his obligations, and he contends that the contract does not require anything more. Shapiro asserts that his exercise of control over the website domains and social media accounts post-termination was not a breach of the contract, because the contract language released him of all obligations upon termination. He further contends that nothing in the contract precluded him from purchasing additional domains post-termination or from applying for a federal trademark or purchasing Dr. Love's federal trademarks post-termination.

In this case, as this Court has already held, Maryland law applies to the breach of contract claim. (*See* Mem. Op. 14 n. 11, ECF No. 44.) Contract interpretation is a question of law. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 544 (Md. 2003) (citations omitted). Maryland follows the objective approach to contract interpretation. *Gables Constr., Inc. v. Red Coats, Inc.*, 207 A.3d 1220, 1241 (Md. Ct. Spec. App. 2019) (citing *Sy-Lene*, 829 A.2d at 546). Under the objective test, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Id.* If the clear language is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, considering the context in which it is used. *Id.* "[T]he true test of what is meant is not what the parties to the contract

intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Ocean Petroleum, Co., Inc. v. Yanek*, 5 A.3d 683, 690 (Md. 2010) (citation omitted).

First, with regard to Hyperheal's claim that it owns all rights in the term "hyperheal," it is important to clarify that no rights exist in a term apart from its commercial purpose in identifying the company, its product, or its service, and the protections and limitations of those rights are established by applicable state or federal trademark laws. *See* 15 U.S.C. § 1127. "Trademark law serves the important functions of protecting product identification, providing consumer information, and encouraging the production of quality goods and services." *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).

For example, a trade name, such as Hyperheal or Hyperheal Hyperbarics, Inc., denotes a business or association and its good will, while trademarks and service marks identify and distinguish goods and services. *See Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989) ("Trademarks and trade names are technically distinct. Trade names are symbols used to distinguish companies, partnerships and businesses. Trade names symbolize the reputation of a business as a whole. In contrast, trademarks and service marks are designed to identify and distinguish a company's goods and services."). The major legal distinction between trademarks and trade names is that trade names cannot be registered and are, therefore, not protected under 15 U.S.C. § 1114. *Id.* "As a practical matter, courts are rarely called upon to distinguish between trade names, trademarks and service marks. Trade names often function as trademarks or service marks as well." *Id.*

However, a crucial distinction is that trademark protections "cannot be transformed into rights to control language." *Lamparello*, 420 F.3d at 313 (citation omitted). Put simply, you can own a trade name, you can own a trademark, you can own a service mark, but you cannot own a word. "[A] trademark owner has at best a quasi-property right in his mark, and can only prevent its use so as to maintain a confusion-free purchasing public." *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989)). Hyperheal cannot assert control over the use of the term "hyperheal" beyond its reach as an identifier for the company or its services. Of course, nor can Shapiro own the term, so although he may have originally coined it, it was not his to transfer to Hyperheal.

For the same reasons, Hyperheal cannot assert control over Shapiro's use of the term "founder." The fact remains that Shapiro was the founder of Hyperheal. Shapiro agreed he would not represent himself as having authority to represent Hyperheal while he was an employee, and he certainly cannot represent himself as having authority to represent Hyperheal post-termination. However, Shapiro is not restricted from identifying himself factually as the original founder of Hyperheal Hyperbarics, Inc. and indicating his current minority ownership interest in the company.

A reasonable objective interpretation of the Employment Agreement results in the conclusion that Shapiro relinquished rights to the use of the "Hyperheal" corporate name and trade name. Shapiro agreed to transfer "any and all ownership or other rights . . . in any intellectual property . . . or other property, tangible or intangible, that has ever been used in or with respect to the business operated by [Hyperheal] . . . ." (Employ. Agmt. 2, ECF No. 14-

3.)  The company's name, whether specifically referenced in the non-exclusive list of property transferred by Shapiro, was certainly included.  (*See id.*)  Shapiro created the name and had used it since 2007 for the hyperbaric services business.  The corporate name, Hyperheal Hyperbarics, Inc., was registered in 2012 in Maryland and has been registered continually since that time.  Therefore, Hyperheal's corporate name is protected by its registration in Maryland, its trade name is protected under common law, and Shapiro relinquished the right to use the Hyperheal name within the geographic scope of that protection.

Shapiro also relinquished rights to the Hyperheal trademark.  Shapiro had filed a trademark application for Hyperheal Hyperbarics, Inc. with the USPTO on November 2, 2016.[16]  (Am. Compl. Ex. 11, ECF No. 14-11.)  Shapiro was on notice of Dr. Love's federal trademark after February 10, 2017.  (*See* Mem. Op. 4, ECF No. 44 (citing Def.'s Ex. 12).)  The Employment Agreement transferring all Shapiro's intellectual property rights was effective March 6, 2017.  Therefore, regardless whether a federal trademark issued then, later, or not at all,[17] Shapiro signed over the rights to the trademark that he owned at that time.  The rights he owned, however, were simply the common law trademark rights and not a federally registered trademark.  Importantly, "[t]he territorial extent of ownership rights in an unregistered mark is not unlimited."  *Emergency One, Inc. v. American Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 268 (4th Cir. 2003) (citing *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279,

---

[16]     Shapiro averred that he had been using the mark since March 7, 2007 and in commerce since May 11, 2012.  (Am. Compl. Ex. 11, ECF No. 14-11.)

[17]     The application was ultimately abandoned and no federal trademark issued.  Shapiro filed a new application for registration on May 1, 2018, after he was terminated.  (Mot. Ex. 12, ECF No. 83-14.)  Shapiro also purchased an assignment of Hyperheal trademarks from Dr. Tommy Love on May 16, 2018, post-termination. (Mot. Ex. 11, ECF No. 83-13.)

1282 (4th Cir. 1987)). "The common law rights are restricted to the locality where the mark is used and to the area of probable expansion." *Id.* (quoting *Spartan Food*, 813 F.3d at 1282). Trademark laws allow concurrent use of the same mark by multiple adopters so long as each adopter's use of the mark does not unreasonably intrude on another user's geographic zone of exclusivity. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 233 (4th Cir. 2002). Therefore, the trademark rights transferred to Hyperheal are limited to Hyperheal's geographic reach.

Shapiro also relinquished the rights to the Pre-Termination Domain Names, and he transferred those domains to Hyperheal. (Employ. Agmt. 2, ECF No. 14-3.) Although he reasserted control over them after his termination, he has since entered into a consent agreement under which he has permanently released all control over them and waived all rights to them.[18] Shapiro also transferred the rights to all social media accounts, including but not limited to Facebook, Twitter, and LinkedIn. (*Id.*) There does not appear to be any further dispute between the parties over Hyperheal's ownership and control over the Pre-Termination Domain Names or the social media accounts, although Hyperheal seeks a permanent injunction to prevent Shapiro from trying to reassert control over them.

A reasonable, objective interpretation of the Employment Agreement also results in the conclusion that Shapiro permanently relinquished exclusive control and all rights to the Hyperheal intellectual property that he owned at the time, i.e., the common law trademarks, the website domain names, and the social media accounts. For example, Shapiro agreed to

---

[18]    The parties agreed to contact GoDaddy to ensure that the domain names were properly transferred to Hyperheal, so this Court expects that there remain no further website domains not included in the Consent Order. *See* Report & Recommendation 2, ECF No. 82.

"sign such documents and take such other steps as may be necessary to confirm that [Hyperheal] is the owner of all such property and accounts and to give [Hyperheal] complete control [and] exclusive control over such property and accounts," and he agreed to not "act as [Hyperheal's] representative or agent with respect to any such property or any other matter." (Employ. Agmt. 2, ECF No. 14-3.) Shapiro agreed that he had "minority shareholder rights only." (*Id.*) He also agreed to "immediately turn over, provide, and relinquish to [Hyperheal] all property, documents, and materials that have ever been used in [Hyperheal's] business and that are or may be in [his] possession, custody, or control." (*Id.*) Further, Shapiro agreed to "immediately turn over to [Hyperheal] and permanently relinquish control of any DME license and any other license, certificate, or other government or private right [he] may have related to [Hyperheal]." (*Id.* at 2-3.)

Under "Effect of Termination," the Employment Agreement states: "Upon termination of this agreement for any reason, neither party shall have any further rights, duties or obligations under this agreement, except to carry out the provisions which contemplate performance after termination or expiration." (*Id.* at 5.) Shapiro argues that this clause has the effect of releasing him from all obligations. However, Shapiro had already agreed to relinquish all the Hyperheal intellectual property rights that he owned, and no reasonable interpretation of the termination clause allows him to reassert control over rights that he either had relinquished or was obligated to have relinquished. The obligation, however, does not extend to property or rights that he might obtain after termination. Therefore, Shapiro's exercise of control over the website domain names and social media accounts after having transferred them to Hyperheal constitutes a breach of his obligations under the Employment

Agreement. Notably, Shapiro's purchase of different website domains after termination does not constitute a breach of his Employment Agreement. However, his registration of substantially similar website domain names that include Hyperheal's name could cause a likelihood of confusion such that Shapiro may be found liable for trademark infringement under the Lanham Act (Count V). Registration of website domains that are confusingly similar to a trademark could also lead to a cybersquatting[19] claim.

Hyperheal does not seek damages for breach of contract but rather is requesting that the contract be specifically enforced. Specific performance is an equitable remedy to be decided by the court. *See Cattail Assocs., Inc. v. Sass*, 907 A.2d 828, 844 (Md. Ct. Spec. App. 2006) "Generally, a party seeking specific performance must 'be able to show that he has fully, not partially, performed everything required to be done on his part.'" *Id.* at 843 (quoting *Clayten v. Proutt*, 175 A.2d 757, 760 (Md. 1961)).

There are no contentions that Hyperheal has failed to perform its obligations under the Employment Agreement. Therefore, Hyperheal shall be granted specific performance to the extent that it can be achieved. To the extent necessary, Shapiro shall relinquish and transfer to Hyperheal any and all control over, and ownership rights in, the social media accounts and any remaining pre-termination website domains[20] containing the name "Hyperheal." Further,

---

[19]    *See* Anticybersquatting Consumer Protection Act ("ACPA"), § 1000(a)(9); 15 U.S.C. § 1125(d). The ACPA authorizes a trademark owner to bring a civil suit against any person who: "(i) has a bad faith intent to profit from that mark . . . ; and (ii) registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to or [in certain cases] dilutive of that mark . . . ." 15 U.S.C. § 1125(d)(1)(A).

[20]    If there are any. As stated above, the parties agreed to contact GoDaddy to ensure that all domain names were properly transferred to Hyperheal, so this Court expects that there remain no further website domains to be transferred.

Shapiro shall be permanently enjoined from asserting control over Hyperheal's intellectual property.[21]

However, the geographic scope of protection of Hyperheal's property is still at issue. Hyperheal did not choose to federally register its trademark. As discussed above, it owns only common law trademark rights, which was all that Shapiro owned and transferred to Hyperheal. Therefore, Hyperheal can only prevent others, including Shapiro,[22] from using its name and trademark in the geographic territories where it has senior rights. *See Emergency One*, 332 F.3d at 271; *see also Harrods*, 302 F.3d at 233 (noting that trademark laws allow concurrent use of the same mark by multiple adopters so long as each adopter's use of the mark does not unreasonably intrude on another user's geographic zone of exclusivity). Such acceptable use includes the registering of website domains that contain the mark, although use on the internet cannot be manipulated to intrude on another's territory in bad faith. *Harrods*, 302 F.3d at 233-34. [23]

Although Shapiro was not precluded by the Employment Agreement from registering the Post-Termination Domain Names, material factual questions remain whether the website domains were registered in bad faith and are likely to cause confusion. Hyperheal has not alleged a cybersquatting claim, but it has alleged, in Count V, that Shapiro's use of the

---

[21]    Hyperheal separately seeks declaratory relief and a permanent injunction under Count IV. (Am. Compl. 11-14, ECF No. 14.)

[22]    Notably, the Employment Agreement contained no non-compete clause.

[23]    The domain name system is an element of the architecture of the Internet, names are registered on a first-come, first-served basis, and the domain name becomes a unique identifier globally for the website. Inevitably, the lack of geographic limitations with a website domain registration leads to a clash with trademark law. Courts look to a set of factors to determine if domain names have been registered in bad faith and are likely to cause confusion. *See Harrods*, 302 F.3d at 231-34 (evaluating nine factors to determine if domain names had been registered in bad faith to capitalize on a famous trademark).

Hyperheal name constitutes trademark infringement under the Lanham Act. There are genuine and material disputes of fact related to the geographic scope of Hyperheal's business, as well as issues around the validity of Shapiro's federally-registered trademarks that may affect Hyperheal's geographic reach. Accordingly, the scope of the permanent injunction and the disposition of the Post-Termination Domain Names must await the jury's resolution of these issues. Hyperheal's motion for summary judgment on Count I shall be GRANTED IN PART and DENIED IN PART.

## II. Tortious Interference (Count II)

Hyperheal claims that Shapiro tortiously interfered with its business relations by asserting control over Hyperheal's intellectual property and usurping corporate opportunities. (Mot. Mem. 17-18, ECF No. 83-1.) Shapiro argues that summary judgment on Count II must be denied because Hyperheal cannot show that he acted with malice, and Shapiro denies that he intended to harm Hyperheal. (Def.'s Resp. Mem. 23, ECF No. 91-1.)

To prevail on a tortious interference with business relations claim, a plaintiff must show: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff; (3) done to cause damage and loss, without right or justifiable cause on the part of the defendant[] (which constitutes malice); and (4) damage resulting." *Press v. United States*, No. JKB-17-1667, 2018 WL 1211537, at *8 (D. Md. Mar. 8, 2018) (*citing Kwang Dong Pharm. Co. v. Han.*, 205 F. Supp. 2d 489, 496 (D. Md. 2002)) (applying Maryland law). The malice requirement serves to distinguish between "the rough and tumble of the marketplace" and behavior that is "wrongful so as to give rise to a cause of action in tort." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994) (citations omitted). To draw this line, and protect

competition while punishing wrongdoers, Maryland law requires a showing, generally, of "both a tortious intent and improper or wrongful conduct." *Id.* at 271 (quoting *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994)). That is, intent to engage in bad behavior aimed at harming a competitor, as well as some improper or wrongful conduct.

In *Natural Design, Inc. v. Rouse Co.*, the Court of Appeals of Maryland stated:

> [I]n some contexts the element of "malice" appears to have its traditional meaning of ill will or spite. In other contexts, the Court has stated that "malice" means legal malice, and not ill will or spite, and that legal malice means "a wrongful act done intentionally without just cause or excuse." Also, an act has been deemed malicious if it is unlawful. The absence of just cause or excuse, or the element of malice, has actually been determined on a case by case basis. For example, while there is no right to cause economic damage to another through the use of "force, violence, threats of force or threats of violence, intimidation or coercion," whether specific acts are deemed coercive depends on the circumstances.

485 A.2d 663, 675 (Md. 1984) (citations omitted).

The existence or absence of malice creates a genuine issue of material fact that prevents summary judgment. A reasonable jury could conclude that Shapiro did not act with requisite malice or it could conclude that he did and that his intent rose to the level of tortious interference. With regard to the corporate opportunity doctrine, Hyperheal's contentions are unavailing. As a 2.38% minority shareholder holding no office and having no control, Shapiro did not violate the corporate opportunity doctrine. *See Bender v. Schwartz*, 917 A.2d 142, 157 (Md. Ct. Spec. App. 2007) (holding that the corporate opportunity doctrine precludes

corporate officers and directors from taking personal advantage of their corporation's business opportunities).[24]

Accordingly, Hyperheal's request for summary judgment on Count II shall be DENIED.

## III.    Unfair Competition–Misappropriation (Count III)

Hyperheal asserts that Shapiro engaged in unfair competition under Maryland law by misappropriation of products. (Mot. Mem. 23, ECF No. 83-1.)   The "products" that Hyperheal refers to are its intellectual property, including the Hyperheal brand, websites, registered domain names, social media accounts, and trademarks.  (*Id.*)  Although not directly addressing a misappropriation claim, Shapiro asserts that he was not in competition with Hyperheal, and "he never intended to provide hyperbaric treatment anywhere near where [Hyperheal] was already providing it."  (Def.'s Resp. Mem. 25, ECF No. 91-1.)

To prevail on a misappropriation cause of action, a "species of unfair competition under Maryland common law," a plaintiff must show: (1) "time, labor, and money . . . in the creation of the product misappropriated"; (2) "a competitive relationship [existed] between the plaintiff and the defendant"; and (3) "commercial damage to the plaintiff." *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 496 n. 3 (D. Md. 2010) (citing *GAI Audio of N.Y., Inc. v. Columbia Broadcasting Sys., Inc.*, 340 A.2d 736, 747 (Md. Ct. Spec. App. 1975)).

As described above, there are genuine issues of material fact remaining related to Hyperheal's trademark territory, which may impact whether a competitive relationship exists

---

[24]    This Court notes that during the motions hearing, Hyperheal conceded that there is no Maryland jurisprudence holding that a minority shareholder, without more, has a duty of loyalty to the corporation.

between Hyperheal and Shapiro. There is also a material dispute regarding whether Hyperheal has suffered any commercial damage. (*See* Def.'s Resp. 25 n. 7, ECF No. 91-1.) Accordingly, Hyperheal's request for summary judgment on Count III shall be DENIED.

## IV.    Declaratory Relief (Count IV)

For the reasons described in the discussion under Count I, Hyperheal shall be granted declaratory relief and a permanent injunction to the extent that a jury finds Hyperheal's scope of intellectual property rights extend geographically. To the extent necessary, Shapiro shall relinquish and transfer to Hyperheal any and all control over, and ownership rights in, the social media accounts and any remaining pre-termination website domains[25] containing the name "Hyperheal." As noted, there are material factual disputes that must be resolved by a jury before this Court can issue its rulings of law regarding Shapiro's claims of ownership over the Post-Termination Domain Names and federally-registered trademarks. However, Shapiro will not be restricted from identifying himself as the original founder and minority shareholder of Hyperheal Hyperbarics, Inc.

Accordingly, Hyperheal's request for summary judgment on Count IV shall be GRANTED IN PART and DENIED IN PART subject to the jury's findings.

## V.    Trademark Claims Under the Lanham Act (Counts V and VI)

Hyperheal asserts that Shapiro's trademarks, purchased from Dr. Love, must be canceled as fraudulently obtained and also contends that Hyperheal used the trademark nationally first in commerce. (Pl.'s Mot. Mem. 24, ECF No. 83-1.) Hyperheal also asserts

---

[25]    If there are any. As stated above, the parties agreed to contact GoDaddy to ensure that all domain names were properly transferred to Hyperheal, so this Court expects that there remain no further website domains to be transferred.

that Shapiro's actions constitute unfair competition under the Lanham Act because his misrepresentations as to his affiliations with Hyperheal have created a likelihood of confusion. (*Id.* at 30.) Shapiro asserts that the trademarks he purchased from Dr. Love are valid, and the assignment is valid. (Def.'s Resp. Mem. 10-12, ECF No. 91-1.) Shapiro does agree that Hyperheal has established prior (senior) use of the mark in at least Anne Arundel and Baltimore counties in Maryland. (*Id.* at 12-14.) However, Shapiro contends that Hyperheal's trademark protection does not extend beyond that territory, much less nationally. (*Id.*)

As discussed above, there are multiple material disputes of fact related to the trademark issues that prevent summary judgment for either party. For example, the likelihood of confusion is an "inherently factual issue." *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155 (4th Cir. 2014) (quoting *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 92 (4th Cir. 1997)). It is invariably a question for the jury to decide. *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992). Further, to cancel a registered trademark on the basis of procurement by fraud, there must be a showing by clear and convincing evidence that the "applicant or registrant knowingly ma[de] a false, material representation with the intent to deceive the PTO." *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 174-75 (3d Cir. 2017) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009)). Intent by its nature is almost always a jury question, since its determination rests on the particular facts of the case and witnesses' credibility. *See, e.g., Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) ("Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie."). Further, whether the Post-

Termination Domain Names were registered in bad faith and cause a likelihood of confusion with Hyperheal's trademark and websites are inherently factual issues.

The resolution of these issues requires factual findings and credibility determinations that are inappropriate in the summary judgment context. Accordingly, Hyperheal's request for summary judgment related to the Lanham Act claims shall be DENIED.

## VI. Shapiro's Motion for Summary Judgment

Shapiro also seeks judgment as a matter of law that he owns (1) the Post-Termination Domain Names, and (2) the federal trademarks. (Def.'s Mot. Mem. 2, ECF No. 91-1.) For the reasons discussed above, Shapiro's motion shall be DENIED. There are material disputes of fact related to the geographic scope of Hyperheal's trademark protection, the likelihood of confusion with regard to Hyperheal's trademark claims under the Lanham Act, and the validity of the federal trademarks, that must be determined by a jury before Shapiro's ownership claims can be resolved. Therefore, judgment as a matter of law that Shapiro owns the Post-Termination Domain Names and federal trademarks shall be DENIED.

## CONCLUSION

For the foregoing reasons:

1. Hyperheal Hyperbarics, Inc.'s Motion for Partial Summary Judgment (ECF No. 83) is GRANTED IN PART and DENIED IN PART.

   a. Judgment as a matter of law that Eric Shapiro breached the Employment Agreement (Count I) is GRANTED.

   b. The remedy of specific performance is GRANTED with regard to the Pre-Termination Domain Names and social media accounts, but the scope of specific performance related to trademarks remains pending the jury resolution of material factual disputes.

c.   Judgment as a matter of law that Eric Shapiro is liable for tortious interference (Count II) is DENIED.

d.   Judgment as a matter of law that Eric Shapiro is liable for Unfair Competition–Misappropriation (Count III) is DENIED.

e.   Judgment as a matter of law that Eric Shapiro is liable for unfair competition and infringement under the Lanham Act (Count V) is DENIED.

f.   Judgment as a matter of law that the federally-registered trademarks are invalid (Count VI) is DENIED.

2.   Shapiro's Motion for Summary Judgment (ECF No. 91) is DENIED.

a.   Judgment as a matter of law that Shapiro owns the Post-Termination Domain Names is DENIED.

b.   Judgment as a matter of law that Shapiro owns the federally-registered trademarks is DENIED.

3.   The following causes of action shall proceed to a jury trial to commence on August 19, 2019: Count II (Tortious Interference); Count III (Unfair Competition–Misappropriation); and Count V (Lanham Act). Based on the jury's findings of fact, this Court will issue its rulings of law on Count I (Specific Performance); Count IV (Declaratory Relief–Injunction); Count VI (Declaratory Relief Regarding Trademark Rights); and Shapiro's claims of ownership over the Post-Termination Domain Names and federally-registered trademarks.

4.   A separate Order follows.


Dated:  August 2, 2019.                              _____/s/_____

                                                     Richard D. Bennett
                                                     United States District Judge